**Harriet H. DEWITT and Steve O'Rear, Plaintiffs, pro se,**

v.

**Brenda HUTCHINS and Lady B. Goode, Inc., Defendants.**

**No. 1:03CV337.**

United States District Court, M.D. North Carolina.

March 23, 2004.

Steve O'Rear, Cloudland, GA, pro se.

Harriet H. Dewitt, Cloudland, GA, pro se.

Jeffrey B. Watson, Allman, Spry, Leggett & Crumpler, P.A., Winston–Salem, NC, for defendants.

### ORDER OF THE UNITED STATES MAGISTRATE JUDGE

DIXON, United States Magistrate Judge.

This matter is before the court on Defendant Brenda Hutchins' motion to dismiss the claims against her under Rule 12(b)(6) of the Federal Rules of Civil Procedure (docket no. 17–1), and on Plaintiffs' motion to amend their complaint (docket

no. 43–1). The parties have consented to the jurisdiction of a magistrate judge. For the following reasons, Defendant Hutchins' motion to dismiss is granted and Plaintiffs' motion to amend their complaint is denied. Furthermore, although Plaintiffs waived their right to a jury trial, the court will exercise its discretion under Rule 39(b) of the Federal Rules of Civil Procedure and allow Plaintiffs to proceed with a jury trial.

### Background Facts

The complaint alleges the following facts: Pro se Plaintiffs Harriet DeWitt and Steve O'Rear are married residents of Cloudland, Georgia. Together they own Iron Age Crafters, Inc. ("IAC"), a closely held corporation that is in the business of "designing and manufacturing iron silhouette furnishings such as gates, light fixtures, tableware, and fireplace screens."[1] Compl. ¶ 1. Dewitt, O'Rear, and IAC have developed a reputation for their distinct designs and trade dress, and they often create custom products in response to requests from direct buyers, wholesalers, and distributors throughout the nation.[2] Compl. ¶ 13. Plaintiffs allege that IAC, Dewitt, and O'Rear own the design and trade dress rights for the products, and they have never sold, consigned, or shared the rights with third parties.

Defendant Lady B. Goode, Inc. ("LBG") is a closely held corporation that manufactures, markets, and distributes furnishings and lighting fixtures. LBG is located and headquartered in High Point, North Carolina. Defendant Brenda Hutchins, a resident of Winston–Salem, North Carolina, is the part or sole owner of LBG as well as the registered agent for LBG. Furthermore, Hutchins is both a shareholder and employee of LBG, and she "is exclusively responsible for the management and marketing of LBG products, with the assistance of her employees and agents." Compl. ¶ 2.

Plaintiffs allege that sometime in late 2001, Defendant Hutchins approached Plaintiffs and asked them if they could translate the idea of a maypole into an iron chandelier for LBG to market and sell to third parties. The parties eventually entered into a contract in which Plaintiffs agreed to design, construct, and deliver numerous lighting fixtures and tableware, based on agreed-upon themes, to LBG, which would then wire, market, and sell the products to third-party buyers.[3] Compl. ¶ 14. Plaintiffs agreed to pay for the costs of translating the products' themes into designs and manufacturing formats and providing prototypes, and Defendants agreed to pay for the costs of marketing and selling the final products. The parties agreed to split the profits, and they further agreed that the "profit" from each sale would be the selling price minus the "Product Cost," which was "the cost of actual production, including cutting, powder coating, construction, wiring, shipping and labelling." Compl. ¶ 14. Plaintiffs further allege that under the contract Defendants agreed to provide an accounting for each sale, including sale price and collection details, in a timely and professional manner, to maintain all records of those transactions, and to pay to Plaintiffs in a timely manner the parties' agreed-to profit split. Compl. ¶ 15.

---

1. The complaint alleges that, in making the iron silhouette furnishings, Plaintiff Dewitt first draws the silhouettes by hand or computer. The drawings are then translated into iron, which is then fabricated by Plaintiff O'Rear, who welds and crafts the parts into products. Compl. ¶ 3.

2. Iron Age Crafters maintains a website, located at *www.ironagecrafters.com*.

3. It appears that the contract was verbal because Plaintiffs neither allude to nor attach any written contract to their pleadings.

Plaintiffs further allege that the parties also agreed that neither party would be responsible for providing an accounting of that party's costs. Compl. ¶ 16, 17. That is, Plaintiffs were not required to provide an accounting for the costs incurred in design and fabrication, and Defendants would have no input into Plaintiffs' decisions regarding those costs. Similarly, Defendants were not required to provide an accounting for the costs incurred in marketing, presenting, and advertising the products, and Plaintiffs would have no input into Defendants' decisions regarding those costs. Finally, Plaintiffs allege that Defendants agreed to credit IAC with design of the iron products in the form of labeling or similar attribution, thus notifying third-party buyers that the trade dress rights belonged solely to IAC. Compl. ¶ 21.

Beginning in Fall 2001, Plaintiffs delivered to LBG prototypes of numerous agreed-upon products requested by LBG, including prototypes of chandeliers, sconces, and other items. LBG subsequently ordered about thirty chandeliers, matching sconces, plateaus, and napkins rings, which Plaintiffs delivered to LBG on or around April 2002.[4] Up until around August 2002, Plaintiffs continued to design, fabricate, and ship prototypes and final products to LBG upon LBG's requests. During that time, however, Defendants failed to comply with the terms of the contract in numerous ways, including, among other things, by failing to maintain and provide timely and accurate sales records; by failing to make timely payments (or any payments at all) to Plaintiffs; by failing to credit IAC with the products' designs and instead passing the designs off

as exclusive designs of LBG; and by failing to account for or return inventory that LBG did not sell. Plaintiffs allege that they demanded in numerous telephone conversations and letters all payments due and a full sales accounting, and that they eventually demanded that LBG stop marketing, advertising, or selling any of the remaining inventories, but that LBG has continued to market, advertise, and sell IAC's products while passing IAC's designs off as its own, despite LBG's representations to the contrary. With these background facts in mind, I will now turn to Plaintiffs' motion for leave to amend their complaint and Defendant Hutchins' motion to dismiss.

### Discussion

In their complaint, filed on April 16, 2003, Plaintiffs seek to recover against Defendants for patent law violations under the Lanham Act, 15 U.S.C. § 1125, and under state law claims for breach of contract, misrepresentation, and unjust enrichment.[5] Compl. ¶ 31. Plaintiffs also request an injunctive order under the Lanham Act's injunctive relief provision, 15 U.S.C. § 1116, enjoining Defendants from marketing, advertising, reproducing, or selling any design or product of IAC, and a declaratory judgment that Plaintiffs are sole owners of the design and trade dress rights for each of the designs sold or delivered to LBG. Furthermore, Plaintiffs have now filed a motion for leave to amend their complaint to bring additional claims for fraud and fraudulent inducement, to demand a jury trial, to add factual allegations based on "newly discovered evidence" to support the fraud and fraudulent induce-

---

4. Plaintiffs also allege that, upon Defendants' requests, Plaintiffs built a mock three-story, French chateau chicken "house" and delivered the house, stocked with live designer chickens, to Defendants for marketing and display at a furniture market in High Point, North Carolina. Compl. ¶ 25.

5. On October 7, 2003, Defendants filed their answer, along with the motion to dismiss by Hutchins. Because of Defendants' untimely answer, Plaintiffs filed a motion for entry of default against Defendants, which this court subsequently denied.

ment claims, and to allege factual allegations to support a finding of individual liability against Defendant Hutchins based on the piercing of the corporate veil doctrine and other theories. Defendants object to Plaintiffs' motion to amend, arguing that the motion should be denied for numerous reasons, including, but not limited to, the following: the motion for leave to amend was filed after the deadline imposed by the court's scheduling order; the motion is futile; the motion would cause undue prejudice to Defendants; the motion was filed with undue delay; and the motion was filed in bad faith and with dilatory motives. For the following reasons, Plaintiffs' motion to amend their complaint is denied.

█ Rule 15(a) of the Federal Rules of Civil Procedure applies to motions to amend complaints and generally states that leave to amend shall be freely granted when justice requires unless there are valid reasons for denying leave, such as undue delay, bad faith or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). When a scheduling order has been entered, however, Rule 16(b) is also implicated. *See Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 631 (D.Md.2003). Rule 16(b) provides that a scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." As a result of Rule 16(b), when a party moves to amend his pleading after the scheduled time for amendments has passed, the party is effectively asking the court both for an amendment to the scheduling order and for leave to amend the pleading. *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.*, 218 F.R.D. 455, 459–60 (M.D.N.C.2003). This court recently discussed the interplay between Rules 15(a) and 16(b), noting that although this circuit's court of appeals has not specifical-

ly ruled on the interaction between Rule 16(b) and Rule 15(a), the court of appeals *has* explained that a defendant seeking to amend his answer to add a compulsory counterclaim under Rule 13(f) after the time for amendments in the scheduling order has passed must satisfy "both the Rule 16(b) analysis and the Rule 13(f) analysis." *Studio Frames, Ltd. v. Village Ins. Agency, Inc.*, No. 1:01CV876, 2003 WL 1785802, at *1 (M.D.N.C. Mar.31, 2003) (quoting *Essential Hous. Mgmt., Inc. v. Walker*, 1998 WL 559349, at *4 (4th Cir. June 9, 1998) (unpublished opinion)). Thus, in deciding whether Plaintiffs should be granted leave to amend their complaint, it is necessary to consider first whether Plaintiffs can satisfy the "good cause" standard of Rule 16(b) before addressing the more lenient standard of Rule 15(a).

█ "Good cause" under Rule 16(b) exists when evidence supporting the proposed amendment would not have been discovered "in the exercise of reasonable diligence" until after the amendment deadline had passed. *Studio Frames*, 2003 WL 1785802, at *2. Thus, even if the opposing party would not be prejudiced by the modification of a scheduling order, good cause is not shown if the amendment could have been timely made. *See Forstmann v. Culp*, 114 F.R.D. 83, 85 (M.D.N.C.1987); *Aventis Cropscience N.V. v. Pioneer Hi-Bred Int'l, Inc.*, No. 1:00CV463, 2002 WL 31833866, at *2 (M.D.N.C. Dec.12, 2002). Furthermore, a party's failure to comply with a scheduling order due to inattention, error, or unfamiliarity with court procedures will not be excused by his pro se status. As the United States Supreme Court observed in *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993), "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who

proceed without counsel." Accordingly, "pro se litigants are not entitled to a general dispensation from the rules of procedure or court-imposed deadlines." *Jones v. Phipps,* 39 F.3d 158, 163 (7th Cir.1994).

■ Here, an initial pre-trial conference was held before the undersigned on November 19, 2003, in which the parties discussed the terms of a pre-trial scheduling order to be filed in accordance with Rule 16(b) of the Federal Rules of Civil Procedure. On December 17, 2003, a scheduling order was filed under which the parties were given "until December 31, 2003, to request leave to join additional parties or amend pleadings." On December 31, 2003, Plaintiffs filed a "Proposed Amended Complaint," without first requesting leave from the court to do so, in violation of Rule 15(a) and the scheduling order.[6] On January 22, 2004, Plaintiffs filed a motion for leave to amend their complaint, which was also untimely because the deadline to do so had expired on December 31, 2003. Plaintiffs explain their untimeliness by stating that they interpreted the scheduling order to mean that they could amend their complaint at any time up until December 31, 2003, without first seeking leave to do so. Plaintiffs' faulty interpretation of the scheduling order was no doubt caused by Plaintiffs' unfamiliarity with Rule 15(a) of the Federal Rules of Civil Procedure, which provides, in pertinent part, that a party may amend his pleading *once* as a matter of course at any time before a responsive pleading is served and that *otherwise* a party may amend the party's pleading *only by leave of court or by written consent of the adverse party.* Thus, after expiration of the deadline for amend-

ing the complaint without first requesting leave as set forth in Rule 15(a), Plaintiffs *were required* to request leave from the court before amending their complaint, and they had until December 31, 2003, to do so under the court's scheduling order. Even considering their pro se status, Plaintiffs' unfamiliarity with Rule 15(a) and their consequent misinterpretation of the scheduling order does not constitute "good cause" for their failure to meet the scheduling order deadlines.

I further note that in the parties' initial pre-trial conference held on November 19, 2003, Plaintiff DeWitt informed the court that Plaintiffs intended to amend their complaint based on new information they had obtained. Ms. Dewitt contends that, in response to her statement, the undersigned told her that she was free to file an amended complaint at any time, without any limitations. This assertion is incorrect. in response to Ms. Dewitt's statement about Plaintiffs' intention to amend their complaint, the undersigned explained to her that Plaintiffs could *ask for the court's permission at any time* for leave to amend their complaint. The undersigned further explained that, *along with any request for leave to amend,* Plaintiffs could attach a "Proposed Amended Complaint." It is clear that Plaintiff DeWitt did not understand these clear instructions and that she furthermore was not familiar with Rule 15(a). Plaintiffs' error caused by unfamiliarity with the Rules of Civil Procedure, however, is not enough to show good cause for violating a scheduling order, and the motion to amend will therefore not be granted on this basis.

---

**6.** On the same day, Plaintiffs filed a brief opposing Defendant Hutchins' motion to dismiss filed on October 27, 2003. Although Hutchins' motion to dismiss was based on the allegations made in Plaintiffs' original complaint, Plaintiffs' opposition brief relied on the allegations in the proposed amended com-

plaint to argue that the motion to dismiss should be denied. Thus, Plaintiffs have presented no arguments whatsoever as to whether Plaintiffs' original complaint alleges sufficient facts and theories to impose individual liability against Defendant Hutchins.

Plaintiffs further appear to argue that they have "good cause" for failing to seek leave to amend their complaint by the scheduling order's deadline to add claims for fraud and fraudulent inducement because they discovered "new" information around November 10, 2003, that supports their fraud and fraudulent inducement claims. For instance, Plaintiffs contend that they learned that Defendants were actively marketing IAC products after Plaintiffs demanded that LBG stop marketing the products and after LBG stated that it was no longer marketing IAC products, and furthermore that Defendants were selling the IAC products at higher prices than the parties' agreed-upon prices.[7] According to Plaintiffs, they discovered in November 2003 that Defendants were retaining more than the 50/50 agreed-upon profit split and that Defendants failed to provide Plaintiffs with accounting records, not because of sloppy bookkeeping, but because they did not want Plaintiffs to know the products' true selling prices. This "new" information does not constitute good cause for failing to comply with the scheduling order's deadlines. Again, the scheduling order stated that Plaintiffs had until December 31, 2003, to file for leave to amend their complaint. Since by their own statements, Plaintiffs had privy to the alleged "new" information as of November 10, 2003, Plaintiffs had ample time to comply with the terms of the scheduling order and to request leave to amend their complaint based on this new information by December 31, 2003, and they have not shown good cause for failure to do so. Thus, Plaintiffs may not amend their complaint to add claims for fraud and fraudulent inducement based on this "newly discovered information."

Similarly, Plaintiffs appear to argue that they had "good cause" for failing to seek leave to amend their complaint by the scheduling order's deadline based on their discovery on November 1, 2003, in a telephone conversation with defense counsel, of certain facts about Brenda Hutchins supporting a theory that the corporate entity should be disregarded and to allow Plaintiffs to recover from Hutchins individually.[8] Again, since by their own statements Plaintiffs obtained this "new" evidence on November 1, 2003, Plaintiffs had ample time to file a motion for leave to amend their complaint to add these allegations by December 31, 2003, and they have not shown good cause for failing to do so. In sum, I find that Plaintiffs have not shown good cause to amend their complaint, and I will deny their motion.

I next consider Defendants Hutchins' motion to dismiss her as a Defendant under Rule 12(b)(6). Defendant Hutchins contends that she should be dismissed as a Defendant because LBG is the proper De-

---

7. For instance, Plaintiffs allege that in a letter dated November 11, 2003, to a potential buyer of a "Maypole Chandelier" designed by IAC, agents for LBG gave a listed price of $750 for the chandelier, which Plaintiffs contend was "significantly higher" than the parties' agreed-upon price. First Amended Compl. ¶¶ 81, 82.

8. For instance, Plaintiffs allege in the proposed First Amended Complaint that defense counsel Watson told them, among other things, that "LBG ... was at that time severely undercapitalized and insolvent," that De-

fendant Hutchins "would rather have the company file for bankruptcy than pay [IAC or Plaintiffs] a single cent, and would use her power as owner and controller of LBG to ensure that outcome if necessary," and that Defendant Hutchins "had stated ... her intention of allowing LBG to be insolvent and thereafter starting another corporation to do exactly the same business" in order to "avoid paying any amounts due, including judgments" to IAC or Plaintiffs. First Amended Compl. ¶¶ 100–03. Counsel Watson adamantly denies that he made these statements.

fendant and Plaintiffs have alleged no facts that would allow the court to impose individual liability on Hutchins. For the following reasons, I agree.[9]

In ruling on a motion to dismiss for failure to state a claim, it must be recalled that the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the action. *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir. 1991); *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 887 F.Supp. 811, 813 (M.D.N.C.1995). At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor. *McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325, 327 (4th Cir. 1996).

Dismissal under 12(b)(6) is generally regarded as appropriate only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *McNair,* 95 F.3d at 328 (noting that the proper question is whether in the light most favorable to the plaintiff, the complaint states any valid claim for relief); *Food Lion,* 887 F.Supp. at 813. Stated differently, the issue is not whether the plaintiff will ultimately prevail on his claim, but whether he is entitled to offer evidence to support the claim. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Generally, the court looks only to the complaint itself to ascertain the propriety of a motion to dismiss. *See George v. Kay,* 632 F.2d 1103, 1106 (4th Cir.1980). A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *See Bolding v. Holshouser,* 575 F.2d 461, 464 (4th Cir.1978). Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege any facts which set forth a claim.

■ Here, Plaintiffs have named Hutchins as a Defendant and seek to make her individually liable for the patent law violation, breach of contract, misrepresentation, and unjust enrichment claims arising out of the failed business relationship between Plaintiffs and LBG. In federal cases based on federal question jurisdiction but also containing supplemental state law claims, federal courts must apply the choice-of-law rules of the forum state in analyzing the state law claims. This court has previously stated that, if faced with a choice-of-law question regarding the equitable remedy of piercing the corporate veil, the North Carolina Supreme Court would adopt the internal affairs doctrine and apply the law of the state of incorporation. *Dassault Falcon Jet Corp. v. Oberflex, Inc.,* 909 F.Supp. 345, 349 (M.D.N.C.1995). Here, LBG is incorporated in North Carolina; therefore, this court looks to North Carolina law in determining whether the Complaint alleges facts sufficient to disregard the corporate entity of LBG and therefore impose individual liability on Defendant Hutchins.

9. Pro se Plaintiffs have made several procedural errors that have disadvantaged them in prosecuting this case. These errors most likely would have been avoided had Plaintiffs retained counsel. Although it is certainly Plaintiffs' right to continue to represent themselves, the court takes this opportunity to advise Plaintiffs to reconsider their decision to proceed without counsel, as the procedural burdens will only increase as litigation proceeds.

■ Under North Carolina law, corporate officers and directors are generally not liable for the debts of their corporation.[10] *See* N.C. Gen. Stat. § 55B–9(b) (2001). When a corporate officer acts as an agent for the corporation and enters into a contract with a third party, providing notice that he is acting as the agent for the corporation, the corporate officer is not personally liable for corporation obligations arising from the contract. *Nutek Custom Hosiery, Inc. v. Roebuck,* 587 S.E.2d 502 (N.C.Ct.App.2003); *Baker v. Rushing,* 104 N.C.App. 240, 248, 409 S.E.2d 108, 112–13 (1991). Indeed, one of the advantages of incorporating a business is to shield its owners from personal liability for claims brought against the corporation. North Carolina courts, however, "will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner,* 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). Thus, when a corporation is operated in such a way that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the individual officer shareholder will be treated as one and the same person. *Henderson v. Security Mortg. & Finance Co.,* 273 N.C. 253, 260, 160 S.E.2d 39, 44

(1968). To disregard the corporate entity under this so-called "instrumentality rule,"

> the court must determine the existence of the following elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn,* 313 N.C. at 455, 329 S.E.2d at 330.[11] North Carolina courts have made clear, however, that

> [i]n a close corporation, the principal or sole stockholder [is] permitted by law to play an active role in management, [and] may deal with third parties without incurring personal liability, as long as the separate corporate identity is maintained.

*Statesville Stained Glass v. T.E. Lane Constr. & Supply,* 110 N.C.App. 592, 597, 430 S.E.2d 437, 440 (1993) (where the plaintiff furnished stained glass to a corporate construction company and received only partial payment from the company,

**10.** Although Plaintiffs do not allege that Hutchins is an officer or director, LBG's corporate records filed with the North Carolina Secretary of State indicate that she is the President of LBG.

**11.** The court in *Glenn* further noted several factors that may be relevant in determining whether a corporation is so dominated by its shareholder(s) that there is sufficient control to satisfy the first element of the instrumentality rule articulated above, including inade-

quate capitalization; failure to comply with corporate formalities; complete domination and control of the corporation so that it has no independent identity; excessive fragmentation of a single enterprise into separate corporations; non-payment of dividends; insolvency; siphoning of funds by the dominant shareholder; non-functioning of other officers or directors; and absence of corporate records. *Id.* at 455, 458, 329 S.E.2d at 330–31, 332.

the plaintiff could not recover against the company's sole owner individually for monies owed by the corporation) (quoting 18 Am. Jur.2d *Corporations* § 45 (1985)). Thus, the mere fact that the predominant or sole owner in a closely held corporation exerts significant control over the daily operations of the corporation is not enough to justify disregarding the corporate entity to impose individual liability on the owner.

■ Here, Plaintiffs have not alleged sufficient facts to impose individual liability on Defendant Hutchins under the "piercing the corporate veil" doctrine. Indeed, in their complaint Plaintiffs do not even allude to this theory as a basis for imposing individual liability on Hutchins. At most, Plaintiffs allege that Hutchins was at least part (and perhaps sole) owner of LGB, that Hutchins was a shareholder and employee of LBG, and that Hutchins was "exclusively responsible for the management and marketing of LBG products, with the assistance of her employees and agents." Plaintiffs do not allege that LBG was operated as a mere instrumentality or alter ego for Hutchins, that Hutchins so dominated LBG that, as a corporate entity, LBG had no mind or existence of its own, that Hutchins' control was used to commit fraud against Plaintiffs, or that the control and domination proximately caused Plaintiffs' damages. In sum, the allegations that Defendant Hutchins had an ownership interest in LBG and exercised control over the corporation do not, without more, warrant imposing the equitable remedy of disregarding the corporate entity and imposing individual liability on Hutchins. *See, e.g., Keener Lumber Co. v. Perry,* 149 N.C.App. 19, 560 S.E.2d 817 (2002); *Simmons v. Cherry,* 43 N.C.App. 499, 259 S.E.2d 410 (1979); *Richmond ex rel. Es-*

tate of Richmond v. Indalex Inc., 308 F.Supp.2d 645, —— (M.D.N.C.2004).

■ Furthermore, the Complaint does not allege any other bases for imposing individual liability on Hutchins. In North Carolina, a contract made by a known agent, acting within the scope of his authority for a disclosed principal is the contract of the principal alone, unless the agent has by special agreement assumed personal liability for the obligations of the principal. *Way v. Ramsey,* 192 N.C. 549, 551, 135 S.E. 454, 455 (1926). Thus, a plaintiff cannot hold an agent liable in a suit where the complaint recognizes and alleges agency and nothing further in support of a theory of personal or individual liability.[12] *See Walston v. R. B. Whitley & Co.,* 226 N.C. 537, 541, 39 S.E.2d 375, 377 (1946). Here, although Plaintiffs allege that the contractual obligations were between Plaintiffs and "Defendants," meaning LBG and Hutchins collectively, by Plaintiffs' own assertions LBG is an active North Carolina corporation, Hutchins was acting as LBG's agent, and Hutchins disclosed to Plaintiffs that she was acting on behalf of LBG. Furthermore, the complaint contains no factual allegations indicating that Hutchins at any time communicated to Plaintiffs that she wished to assume *personal* liability for the contractual obligations of LBG. The allegations clearly indicate that the contractual relationship was in fact with the corporate entity LBG, the principal, and that Hutchins was acting as LBG's agent. Thus, Defendant Hutchins' motion to dismiss her as a Defendant is granted.

■ Finally, I will resolve an issue that the parties have raised in their pleadings and court correspondence—that is,

---

12. Under North Carolina's choice-of-law rules for contracts, the court must apply the law of the state that the contract was entered into, which in this case appears to be either North Carolina or Georgia. Because the principal/agency analysis is the same under either state's law. I apply North Carolina contract law here.

whether Plaintiffs properly demanded a jury trial within the dictates of Rule 38(b) of the Federal Rules of Civil Procedure. The Seventh Amendment right to a jury trial is not automatic, and it may be waived if not made within the time limits set by Rule 38(b), which provides:

> Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required by Rule 5(d). Such demand may be indorsed upon a pleading of the party.

Fed. R. Civ. P. 38(b).[13] Furthermore, under Rule 38(d), if a party fails to demand a jury trial pursuant to Rule 38(b), the party is deemed to have waived its right to a jury trial. Here, it is undisputed that Plaintiffs did not demand a jury trial in their complaint. Plaintiffs contend that they complied with Rule 38(b), however, by indicating in a box on the civil cover sheet that they had demanded a jury trial. The notation on a civil cover sheet, however, is not a substitute for the service of written notice of demand for a jury trial within the meaning of Rule 38(b).[14] *Wall v. National R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir.1983); *Omawale v. WBZ*, 610 F.2d 20, 22 (1st Cir.1979). Thus, Plaintiffs waived their right to a jury trial. Fur-

thermore, Plaintiffs did not file a formal motion seeking relief from their waiver under Rule 39(b), which states:

> Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion *upon motion* may order a trial by a jury of any or all issues.

Fed. R. Civ. P. 39(b) (emphasis added). Plaintiffs have, however, consistently demanded a jury trial in correspondence to the court, and they demanded a jury trial in the proposed amended complaint. Thus, although Plaintiffs have not submitted a formal motion under Rule 39(b) for relief from waiver, I will treat their arguments regarding their jury trial demand as a Rule 39(b) motion, *see Lawrence v. Hanson*, 197 F.Supp.2d 533, 536–37 (W.D.Va. 2002), and I will consider the following factors in determining whether to excuse the waiver: (1) whether the issues are more appropriate for determination by a jury or a judge (i.e., factual versus legal, legal versus equitable, simple versus complex); (2) any prejudice that granting a jury trial would cause the opposing party; (3) the timing of the motion (early or late in the proceedings); (4) and any effect a jury trial would have on the court's docket and the orderly administration of justice. *United States v. Anderson*, 584 F.2d 369, 372 (10th Cir.1978). Finally, the written jury demand and the certificate of service must be filed with the court within a reasonable time.

---

**13.** Thus, under Rule 38(b), a party must make a written demand for a jury trial, and the written jury demand must be served on the other party between the filing of the complaint and ten days after the service of the last pleading directed to the issue triable by a jury. The term "last pleading" refers to a pleading which contests the issue triable by a jury, such as an answer to a complaint or a reply to a counterclaim. *See Donovan v. Travelers Trash Co.*, 599 F.Supp. 43, 44 (E.D.N.C. 1984). A motion to dismiss a complaint, however, is not considered a "last pleading" directed to an issue triable by a jury. *See*

**14.** Some courts allow a civil cover sheet on which a jury demand box is checked to serve as a proper jury trial demand if the cover sheet was properly served on the defendants. *See Favors v. Coughlin*, 877 F.2d 219, 220 (2d Cir.1989). Here, there is no indication in the record that the civil cover sheet was served on Defendants.

*Malbon v. Pennsylvania Millers Mut. Ins. Co.*, 636 F.2d 936, 940 n. 11 (4th Cir.1980).

 I find that this case does not present issues so complex as to make jury resolution difficult. Here, the claims sound in patent law and breach of contract. The breach of contract issues are simple and straightforward. Furthermore, since the alleged contract appears to have been a verbal one only, and the case may turn substantially on each party's credibility, resolution by a jury may be particularly appropriate. Furthermore, the existence of patent law in the case does not necessarily call for a bench trial because issues of statutory interpretation or other complex legal questions will likely be decided by the court before trial or in the process of crafting jury instructions. *See Gilbarco, Inc. v. Tokheim Corp.*, No. 2:95CV00581, 1997 WL 608950, at *2 (M.D.N.C. Feb.3, 1997) ("The mere fact that this is a patent infringement case and that some of the issues might involve some complexity does not demand a denial of the Rule 39(b) motion."). I further find that, considering that the trial date is not set until October 2004, Defendants still have ample time to prepare for a jury trial. Thus, Defendants will suffer no significant prejudice if the court allows a jury trial, and a jury trial in this case will not be substantially more burdensome than a bench trial. In sum, application of these factors favors excusing Plaintiffs' waiver of their right to a jury trial.

### Conclusion

For the reasons stated herein, Plaintiffs' motion for leave to amend their complaint is **DENIED**, Defendants' motion to dismiss Brenda Hutchins as a Defendant is **GRANTED**, and the court will exercise its discretion under Rule 39(b) and allow Plaintiffs to have their claims adjudicated by a jury.[15]

---

15. In his correspondence to the court and in at least two telephone calls to chambers, defense counsel has repeatedly urged hasty resolution of the pending motions, noting that Hutchins' motion to dismiss has been pending since October 2003. Until the parties consented on March 10, 2004, to my authority to hear all matters in the case, I lacked authority to address any pending motions until they were referred specifically to me for resolution. Here, the motion to dismiss and motion to amend at issue were not referred to me for disposition until March 1, 2004. Thus, I had no authority to address the pending motions until that date. I have been and am fully aware of the discovery deadlines in this case, and I have attempted to address all pending motions as expediently as possible. Because the parties have now consented to my jurisdiction to hear all matters in the case, future motions will most likely move through the court fairly rapidly.

As to all remaining matters pending before the court, however, I remind the parties and their counsel that inquiries concerning the status of any pending matter in this case shall be directed to the clerk's office in Greensboro only, not to chambers. Chambers personnel will not handle telephone questions regarding the status of pending dispositive motions. I understand and am sympathetic to counsel's concerns about upcoming discovery deadlines, but telephone calls to chambers to inquire about the status of pending motions do not hasten ruling on the motions. In fact, repeated exhortations for the court to "hurry up and rule" on a dispositive motion are akin to a gnat in one's ear and distract the court from its work of moving cases through to disposition.